## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

**MATTHEW VANDERSLOOT,** individually
and on behalf of all others similarly situated,

        *Plaintiff,*

*v.*

**CHARLES BARATTA LLC D/B/A PRIME
MARKETING**

        *Defendant.*

Case No. 24-cv-7096

## BRIEF IN OPPOSITION TO DEFENDANT
## CHARLES BARATTA LLC'S
## <u>MOTION TO DISMISS</u>

## I.  CONTENTS

**II.  Introduction** .............................................................................................................. 1

**III.  Factual Background** ................................................................................................... 1

**IV.  Legal Standard** ......................................................................................................... 2

**V.  Argument** ................................................................................................................. 3

    A.  The Plaintiff has alleged direct liability in far greater detail than in other similar cases. Courts have already determined those allegations sufficient to infer direct liability. ................ 3

    B.  The Complaints are not contradictory ........................................................................ 16

**VI.  Conclusion** .............................................................................................................. 17

## TABLE OF AUTHORITIES

**Cases**

*Abramson v. Josco Energy USA, LLC*, No. 2:21-cv-1322, 2022 U.S. Dist. LEXIS 237792 (W.D. Pa. Aug. 1, 2022) ................................................................................................. 13

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ................................................................... 2

*Bank v. CreditGuard of Am.*, No. 18 Civ. 1311 (PKC) (RLM), 2019 WL 1316966 (E.D.N.Y. Mar. 22, 2019) ........................................................................................................ 6

*Banks v. Pro Custom Solar*, 416 F. Supp. 3d 171 (E.D.N.Y. 2018) ............................................ 11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................... 2, 3

*Charvat v. Allstate Corp.*, 29 F. Supp. 3d 1147 (N.D. Ill. 2014) ................................................ 8

*Consol. Grain & Barge, Inc. v. Anny*, No. CIV.A. 11-2204, 2013 WL 486687 (E.D. La. Feb. 6, 2013) ................................................................................................................. 4

*Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187 (M.D. Tenn. 2017) ................................................................................................................. 15

*Cunningham v. Watts Guerra*, LLP. No. SA-22-CV-363-OLG (HJB), 2024 U.S. Dist. LEXIS 93370 (W.D. Tex. May 23, 2024) .......................................................................... 14, 15

*Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018) ............................................................. 15

*Fridline v. Int. Media, Inc.*, No. 24-CV-01770, 2025 WL 1162492 (M.D. Pa. Apr. 21, 2025) ..... 9

*Martin v. Bottom Line Concepts, LLC*, 723 F. Supp. 3d 270, 275 (S.D.N.Y. 2024) ................. 5, 6

*Melito v. Am. Eagle Outfitters, Inc.*, No. 14-CV-02440 (VEC), 2015 WL 7736547 (S.D.N.Y. Nov. 30, 2015) ........................................................................................................... 12

*Metzler v. Pure Energy USA LLC*, No. 21-CV-9798 (VEC), 2023 WL 1779631 (S.D.N.Y. Feb. 6, 2023) ......................................................................................................................... 12

*Morris v. SolarCity Corp.*, No. 15-CV-05107-RS, 2016 WL 1359378 (N.D. Cal. Apr. 6, 2016) 6, 7, 15

*Roylance v. ALG Real Est. Servs., Inc.*, No. 5:14-CV-02445-PSG, 2015 WL 1522244 (N.D. Cal. Mar. 16, 2015) ......................................................................................................... 11

*Sheski v. Shopify (USA) Inc.*, No. 19-CV-06858-HSG, 2020 WL 2474421 (N.D. Cal. May 13, 2020) ......................................................................................................................... 13

*Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765 (N.D. Ill. 2014) ........................... 11

*Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002) ...................................................................... 4

*Tom v. Forbes*, No. 8:24-cv-1320-SDM-SPF, 2025 U.S. Dist. LEXIS 49113 (M.D. Fla. Mar. 18, 2025) ......................................................................................................................... 14

*Vessal v. Alarm.com*, No. 17 C 2188, 2017 WL 4682736 (N.D. Ill. Oct. 18, 2017) .................. 13

*Zeitlin v. Palumbo*, 532 F. Supp. 3d 64 (E.D.N.Y. 2021) ........................................................... 15

**Statutes**

FED. R. CIV. P. 12(b)(6) ........................................................................................................... 2, 4

FED. R. CIV. P. 8 ......................................................................................................................... 2

**Other Authorities**

Exhibit A - Diagram of Connections ........................................................................... 3, 12, 13, 16

## II.    INTRODUCTION

Attempts by the robocalling industry to blame the victims of their calls for failing to allege "sufficient" facts to state a claim for direct liability are nothing new. Trial and appellate courts have had little trouble rejecting such tactics.

But now, it has come to this.

Defendant Charles Baratta LLC makes a bold assertion without the corresponding factual predicate: that the Plaintiff cannot establish direct liability as to it, *despite speaking* to various Charles Baratta employees on the illegal calls, despite connecting various illegal and unregistered aliases used by Defendant to conceal its identity to the Defendants' employees through the tangled web it has weaved to evade detection, and despite receiving emails from the Defendant's employee at the Defendant's email address. For this reason, this Court, like nearly every other Court to consider similar motions, should reject it. The Plaintiff has plausibly alleged a case for direct liability at the pleadings stage entitling him to further discovery.

Defendant's motion should therefore be denied in its entirety.

## III.    FACTUAL BACKGROUND

The original complaint in this matter was filed in October, with Mr. VanderSloot seeking to represent himself and a class of other individuals similarly situated, based on the Defendant's highly illegal calling campaign through which it called phones, like Mr. VanderSloot and other class members whose numbers are on the National Do Not Call Registry, in blatant contravention of the plain text of the TCPA. After Defendant moved to dismiss the first time, alleging that the Plaintiff had inadequately pled a case for direct liability, Plaintiff amended the complaint as of right. Plaintiff did so after extensively re-reviewing his logs of the calls, the telephone numbers involved, and fictitious names of the people involved with counsel, which culminated in the filing of the First Amended Complaint, which indicated that the first call

Plaintiff had received, which was previously unidentified, was a call from "DeAndre" from the fictitiously named "Legal Helpers." As will be explained below, "DeAndre's" involvement was revealed in that "DeAndre" and "Chris" both used the alias "Legal Helpers," and both sent text messages to Plaintiff from the same telephone number 210-405-8263.

The complaint is clear that, during the calls, the Plaintiff spoke with various Prime Marketing representatives, who all called from illegally-named fictitious entities and various caller IDs, including "spoofed" caller IDs. However, the Plaintiff was also to identify common threads between the callers which indicate that they were calling from the Defendant. Despite these facts, the Defendant has sought to take advantage of its own hidden conduct in this regard and dismiss this case arguing that the Plaintiff has insufficiently alleged direct liability at the pleadings stage, and in so doing minimizes its own illegal conduct. This response follows.

## IV.    LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint that fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rather than require detailed pleadings, the Rules demand only a "short and plain statement" of the claim showing that the pleader is entitled to relief, in order to give defendant fair notice of what the claim is and the grounds upon which it rests, not detailed factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 678 (cleaned up).

In determining whether a claim is plausible, the court must "draw on its experience and common sense." *Id.* at 678. After identifying elements to set forth a claim and removing

2

conclusory allegations, the Court must accept all well-pled factual allegations as true and determine if they give rise to relief. *Id.* A complaint may be dismissed only where it appears that there are not "enough facts to state a claim that is plausible on its face," not merely because the defendant proffers some contrary facts. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## V.    ARGUMENT

A.    *The Plaintiff has alleged direct liability in far greater detail than in other similar cases. Courts have already determined those allegations sufficient to infer direct liability.*

As described above, the Court's analysis must begin and end with whether or not the Plaintiff has plausibly alleged the Defendant's involvement in the calls with sufficient specificity to give rise to the inference of direct liability. He has done so because he has pled facts which sufficiently prove at the pleadings stage that Defendant directly placed the calls complained of through its employees, including "Tiffany," "DeAndre," and "Christopher." The Plaintiff has taken the liberty of assembling the allegations in the Amended Complaint in graphic form, complete with the threads connecting the identified entities, and attached herein as Exhibit A.

As the Amended Complaint's allegations make clear, the level of information and resource sharing between the three individuals with whom the Plaintiff interacted tend to show that the three individuals all work for Defendant Prime Marketing. Of note, both "Chrisopher" and "DeAndre" have access to the same 210-405-8263 phone number, and both "DeAndre" and "Tiffany" have access to the 615-219-6257 number. And *both numbers* sent the Plaintiff a LawMetrics link to upload the Plaintiff's ID, the same link that Christopher Garcia, who has a *Prime Marketing Source email address*, stated the Plaintiff should be expecting. Contrary to the Defendant's pleading in this regard, nothing about that is at all contradictory or evidence that "DeAndre," "Tiffany," or "Chrisopher Garcia" work at different places.

3

Nor is the fact that "Tiffany" asked the Plaintiff if he had heard from her "law associate" Chrisopher at all indicate that "Tiffany" works for someone else. All manner of businesses ask similar questions directly to customers, and it's simply a matter of good business, as colleagues cannot and do not apprise each other of every minute update and detail of work as to each task or file on a daily basis.  Indeed, it is just as plausible (if not more so) that "DeAndre," "Tiffany," and Christopher simply work at different departments or work from home as part of their employment for Prime Marketing and as such are not in constant communication with each other as to the status of client intakes. By Defendant's own logic, any employee checking on whether another employee is helping a customer or if they need to step in would "make no sense." Indeed, Defendant simply has no explanation for why Christopher Garcia and DeAndre both texted Plaintiff from the *same telephone number* and Mr. Garcia also provided his Prime Marketing email to the Plaintiff via text on that number, but then denies that Plaintiff has adequately pled that Mr. Garcia is a Prime Marketing employee.

Defendant cannot be permitted to simply say at the Rule 12(b)(6) stage that "we didn't do it." In essence, the Defendant attempts this defense by disguising it as a challenge to the Plaintiff's allegations of direct liability at the pleadings stage. Rule 12(b)(6) is not an appropriate device for testing the truth of what is asserted in the complaint or for determining whether the plaintiff has any evidence to back up what is in the complaint. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002). However, that's precisely what the Defendant attempts to do here, making a red-herring argument that the Plaintiff has failed to state a claim because he has allegedly failed to set forth facts giving rise to direct liability that the Defendant placed the calls at issue. But that's a "red herring" that begs the question "who did, then?" *See Consol. Grain & Barge, Inc. v. Anny*, No. CIV.A. 11-2204, 2013 WL 486687, at *6 (E.D. La. Feb. 6, 2013).

4

The Southern District's decision in *Martin v. Bottom Line Concepts, LLC*, proves particularly instructive here. In that case, the Plaintiff received a robocall from the fictitious "Bottom Line Capital," and the telephone number, when called back, played a message stating that the caller had reached "Bottom Line Capital." 723 F. Supp. 3d 270, 275 (S.D.N.Y. 2024). Similarly to here, Bottom Line *Concepts*, the defendant there, moved to dismiss on the basis that the amended complaint did not plead any "facts showing any conduct attributable to BLC, as opposed to third parties" and "facts from which the Court could infer that BLC had any relationship with" those third parties, including "Bottom Line Capital." *Id* at 278. The gist of the defendant's argument there, as here, was that "[Bottom Line Concepts] attacks as scant the FAC's factual allegations tying the robocalls to it. These centrally are that the prerecorded message directs the caller to a 1-800 number which answers with a message identifying the number as 'the Employee Retention Hotline brought to you by Bottom[ ]Line Capital,' which the FAC alleges 'is a d/b/a' of BLC, for which BLC is responsible." *Id.* As here, "BLC argues the FAC too sloppily equates it with a (presumably like-initialed) entity responsible for the calls." *Id.*

Nevertheless, the Court flatly rejected the defendant's argument at the pleadings stage reasoning that, "BLC is wrong. The FAC alleges that 'BLC directly initiated' the call at issue and pleads 'factual content [that] allows the court to draw the reasonable inference that [BLC] is liable for the misconduct alleged.'" *Id.* at 282. The Southern District identified several factors and inferences which allowed it to draw that conclusion pertinent to the same analysis here, including that the defendant appeared to own and control the phone number, that the defendant was the beneficiary of the message conveyed via the robocall, and that defendant used a pseudonym to avoid ill will for the defendant's brand. *Id.* For what it's worth, the *Bottom Line* court also rejected the perverse notion that calling the number back somehow did not mean that

5

the defendant called the Plaintiff on the initial calls. As the Court explained, a reasonable factfinder could draw "several relevant inferences: that Bottom Line Capital owned and controlled the phone number used to place the robocall to Martin; that Bottom Line Capital, as the owner of the phone number used to place the robocall, and as the beneficiary of the message conveyed via the robocall, placed the robocall; and that Bottom Line Capital is a pseudonym of BLC, such that an action by Bottom Line Capital is an action by BLC. These allegations plausibly plead BLC's liability for the robocalls Martin claims to have received." *Id.* at 283.

The *Bottom Line* court cited to several decisions where other courts have held direct liability plausibly alleged under similar circumstances, including this Court's decision in *Bank v. CreditGuard of Am.* In that case, the plaintiff spoke to a live operator, like "Tiffany" here, who stated that she was calling "from" one of the defendant's entities, like "Legal Helpers," and where the caller ID led back to the defendant. No. 18 Civ. 1311 (PKC) (RLM), 2019 WL 1316966, at *8 (E.D.N.Y. Mar. 22, 2019). Here, during a call from "Tiffany" originating from a "spoofed" caller ID, the Plaintiff was told to call the phone number 954-800-2991, to reach a "Law Associate" (i.e. Christopher Garcia) and when he did so, was connected to Christopher Garcia, who is a Prime Marketing employee, as confirmed through his email address, and who also used the fictitious name "Legal Helpers," just as did "Tiffany." To that end, Mr. Garcia and "DeAndre" both texted the Plaintiff from the same telephone number, demonstrating control over that number, including having the same information that Plaintiff provided on the initial call. This scenario is almost exactly what occurred in *Morris v. SolarCity Corp.*, where the Plaintiff received a call from a robot that did not mention SolarCity by name, nor did SolarCity appear on the caller ID for any call. No. 15-CV-05107-RS, 2016 WL 1359378, at *2 (N.D. Cal. Apr. 6, 2016). There, the Plaintiff pled that he provided "a fictitious name and address" to the

robot and received a call the following day from a human "who identified himself as a representative of SolarCity, and who asked him to confirm the fictitious name and address." *Id.* at *1-*2.

This is almost exactly what is alleged to have occurred here, with "DeAndre" first calling the Plaintiff on August 30, "Tiffany" calling to follow up on September 4 with the same fictitious information, and "Tiffany" later providing the contact information for Christopher Garcia, which brings the entire calling conduct full circle as both "DeAndre" and Garcia texted the Plaintiff from the same telephone number and both claimed to be (like "Tiffany"), from "Legal Helpers." It is also worth mentioning that "DeAndre," "Tiffany," and "Christopher" also provided the same upload link as well for the Plaintiff to upload his ID to LawMetrics Plaintiff's information as provided on the initial call. Just as in *Morris*, "it is perfectly reasonable to infer Solar City was in some manner responsible for the prior calls, from the fact that its live representative asked Morris to confirm the fictitious name and address he had given to Rochelle. It is more than mere 'temporal proximity.'" *Id.* at *2. Here, Defendant has no explanation for how or why both "DeAndre" and Christopher Garcia, who established that he was from "Legal Helpers" and Prime Marketing Source, have access to the same phone number, 210-405-8263 and both texted Plaintiff from that number. They also have no explanation for how "DeAndre" and "Tiffany" would have obtained the same LawMetrics link sent by Chris using the 210-405-8263 number and later texted it from the 615-219-6257 number they shared. This is most indicative, if anything, of direct liability, as it establishes that two sets of two allegedly unrelated individuals somehow have access to the same phone numbers and sets of information to send text messages to Plaintiff. What is most plausible is that Defendant Prime Marketing maintains several shared telephone numbers from which its employees can text potential customers.

7

For its part, Defendant is also unable to point to any decision holding as inadequate the allegation of direct liability information obtained as a result of a callback as opposed to a direct transfer on the call. Indeed, the *SolarCity* court observed that although specifically mentioning the defendant on a robocall and then transferring the plaintiff directly from a robocall to an internal representative was also indicative of and provided a clearer case of direct liability, citing *Charvat v. Allstate Corp.*, 29 F. Supp. 3d 1147 (N.D. Ill. 2014), "it does not undermine the conclusion that the allegations here are also sufficient to survive dismissal." *Id.* The fact that Chrisopher identified himself as an employee of Prime Marketing based on a call Plaintiff made to a number provided by Tiffany, does not detract from the fact that both individuals stated they were with "Legal Helpers" and Chrisopher confirmed that this was an alias used by Prime Marketing. It also bears mentioning that, despite Plaintiff calling from a different telephone number, Chistopher was able to look up and ascertain the fictitious information Plaintiff provided on the initial call and send a LawMetrics link reflecting that information.

Nor does the fact that the calls Plaintiff received originated from spoofed caller IDs and non-New York area codes alter the analysis, either. That's a distinction without a difference that matters for nothing. Illegal telemarketers often use all manner of telephone numbers, from various locations, including the practice of Caller ID spoofing, as here, in order to obfuscate their identities, especially when, as here, the messages are sent as part of a nationalized calling campaign. With the advent of cell phones and digital telephone services, long gone are the days where one's area code was a good indication of a telephone's location.[1] For its part, Prime

---

[1] For those too young to remember, a telephone used to "ring off the hook" in a "style now seen only in old movies" and have a physical dial that a user had to turn to select a series of letters and digits to call. In those days, there were no such things as area codes, and the first two digits of a phone number were represented by letters, not numbers. After the dial spun back to its home position, you did it again to select the second number. You did it sequentially until you dialed all

Marketing is unable to point to a *single case* dismissing a TCPA complaint on the basis that the area code of the calls did not match the headquartered location of the caller. Indeed, as another Court has observed, "The characteristics of the phone numbers used to message Fridline do not alter this conclusion. . . . First, the Court is unable to consider, nor has Defendant provided evidence to support, that these numbers 'are private numbers connected to individual cell phones.' Even when considering the area codes of the numbers, Plaintiff has adequately connected the numbers to Defendant through the content of the messages. . . . While the area codes are not associated with Missouri, the content of the messages sufficiently connects them to Interest Media." *Fridline v. Int. Media, Inc.*, No. 24-CV-01770, 2025 WL 1162492, at *2 (M.D. Pa. Apr. 21, 2025).

Under the caselaw that Defendant cites to, the Plaintiff does not merely believe that he identified the calls as originating from the Defendant, nor does the Plaintiff conclusorily allege that the telephone numbers are the Defendant's. Rather, the Plaintiff points to *specific evidence in the record* connecting the calls, and the entities that placed them, to each other, and ultimately, to Prime. Indeed, as in *Fridline*, the Plaintiff has identified how the Defendant's entire business model is predicated and akin to that of lead generator and modern-day case runner, obtaining clients' information and then selling that information, together with a retainer agreement, to law firms. *Id.* ("Plaintiff described how Defendant's business model is predicated on solicitation and explained how the tracking links directed recipients to 'internet properties either owned by Interest Media or an affiliate offer promoted on Interest Media's platform.' . . . These allegations

---

the necessary numbers. Out of town calls could take a while. And there were a lot more calls to wrong numbers in those days. *See Perrong v. Victory Phones LLC,* 519 F. Supp. 3d 193, 195 n.1 (E.D. Pa. 2021); *Perrong v. Bradford*, No. 2:23-CV-00510-JDW, 2023 WL 6119281, at *3 n.1 (E.D. Pa. Sept. 18, 2023).

provide the requisite factual support 'to justify that a call came from' Defendant. Nor can it be said that these allegations are unclear or conclusory. Plaintiff has articulated a detailed narrative based on clear factual allegations."). Thus, Defendant's conclusory statement that the Plaintiff has presented "zero non-conclusory facts to support his contention that a 210-405-8263 phone number was owned and operated by Prime" is belied by the *contents of the messages themselves*, where Mr. Garcia confirmed his identity, and *provided his own Prime Marketing email*. Those statements may be simple, but they are nevertheless factual, not conclusory.

Defendant cannot attempt to use its own illegal conduct, including its use of fictitious names, use of multiple spoofed telephone numbers, and hiding behind fictitious identities at the outset of the subject communications to hide the fact that it owns the real telephone numbers at issue, that the calls were all sent by Prime Marketing, or to overcome the reasonable inference at the pleadings stage that Christopher Garcia is its employee and is connected to the other two individuals who are also alleged to be Prime employees, including because they share the same information and telephone numbers. Prime Marketing's unsupported and conclusory claim that the Plaintiff has inadequately pled direct liability, given the facts pled here, should not be allowed to overcome the Plaintiff's well-pled allegations in this regard, either. Despite its best efforts to throw a bloodhound off its tracks, its proverbial fingerprints were nevertheless found on the gun at a murder scene. If that kind of evidence is sufficient to establish probable cause for an arrest of a person's whose fingerprints appear on a weapon, it's more than sufficient to entitle the Plaintiff to discovery to test the contention that Prime Marketing sent the calls and its unsupported counter-allegation that it did not. Even so, Prime Marketing is again unable to point to a single case holding that a TCPA plaintiff must establish the caller's ownership of the telephone number in question in order to state a claim; were that the case, any entity that illegally

10

spoofed their telephone number could dismiss a case at the pleadings stage because it doesn't

own the phone number it used to send the calls.

Simply put, this case is nothing like the conclusory allegations found in the other cases

that the Defendant cites. For example, in *State Farm*, the plaintiffs attempted to pursue a direct

liability theory against State Farm for calls placed by another entity entirely, Variable. *Smith v.

State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765, 771 (N.D. Ill. 2014). That is plainly not the

case here, where all the individuals stated they were calling from the illegal fictitious name

"Legal Helpers," and when Chrisopher Garcia confirmed he was Defendant's employee, using

that alias, but also used that same name from no less than *the same telephone number* as that of

one of the other callers. Similarly, in *Banks v. Pro Custom Solar*, the Plaintiff attempted to sue

Pro Custom for calls that another company, Sunnova, made, based on Sunnova's allegation that

it "works with" defendant. *Banks v. Pro Custom Solar*, 416 F. Supp. 3d 171, 173 (E.D.N.Y.

2018). On those facts, the Court had no trouble concluding that "Sunnova rather than Defendant

is directly liable under the Act," and that the "Plaintiff fails to allege that Defendant initiated the

Calls, which is required to successfully plead direct liability." *Id.* at 173–74. Plaintiff makes

exactly those allegations which the plaintiff in that case did not.

*Roylance* is off base, as well. There, on a *motion for default judgment*, the court denied

default judgment as to an *individual defendant*, Donecia Agustus, on a theory of direct liability

because the plaintiff did not "not allege that Donecia Augustus made the calls herself or allege

facts sufficient to show that she had the calls made on her behalf." *Roylance v. ALG Real Est.

Servs., Inc.*, No. 5:14-CV-02445-PSG, 2015 WL 1522244, at *6 (N.D. Cal. Mar. 16, 2015),

report and recommendation adopted as modified, No. 14-CV-02445-BLF, 2015 WL 1544229

(N.D. Cal. Apr. 3, 2015). *Roylance* does not stand for the proposition that one can never prove a

11

direct liability case against an entity using a fake name, as here, particularly when substantial evidence links the callers to each other, including as reproduced in Exhibit A. Nor does the Southern District's decision in *Melito* help Defendant either. There, like in *Banks* and *State Farm*, the court held that a highly fact-specific process in which American Eagle sent a list of numbers to Experian, which then sent the list to Archer USA, who then sent the text messages on American Eagle's behalf, was insufficient to allege direct liability as against Experian because none of the evidence demonstrated that Experian was involved in the "making, or physical placement, of a text message" but was instead an intermediary in the sending process. *Melito v. Am. Eagle Outfitters, Inc.*, No. 14-CV-02440 (VEC), 2015 WL 7736547, at *1, *3 (S.D.N.Y. Nov. 30, 2015). Plaintiff does not merely allege that "Legal Helpers," "DeAndre," or "Tiffany" are cogs in the process of call placement; rather, the plaintiff alleges that *they directly placed the calls* as employees of Defendant, subject to the Defendant's own direction.

And in *Metzler*, the only allegation as to direct liability was the conclusory one, devoid of any evidence, that "Defendant owns or operates the telephone number from which the offending call originated" and when there were "no factual allegations supporting Plaintiff's bald conclusion that the number from which the voicemail originated is 'owned/operated by or on behalf of Defendant.'" *Metzler v. Pure Energy USA LLC*, No. 21-CV-9798 (VEC), 2023 WL 1779631, at *5 (S.D.N.Y. Feb. 6, 2023). Here, the Plaintiff points to actual evidence, including website links and emails linking the Defendant's employees and services to the information, calls, and text messages at issue, not conclusory allegations, as in *Metzler*, based on a voicemail that did not even name the Defendant as the seller of electric services. Similarly, in *Sheski v. Shopify (USA) Inc.*, the plaintiff sued Shopify, an online shopping cart platform that allows sellers to add functionality using apps, for text messages sent by one of the add-on apps, not

Shopify. No. 19-CV-06858-HSG, 2020 WL 2474421, at *2 (N.D. Cal. May 13, 2020). So too in *Vessal*, where *independent dealers* of the Defendant Alarm.com were alleged to have directly placed the calls at issue, rendering Alarm.com not directly liable. *Vessal v. Alarm.com*, No. 17 C 2188, 2017 WL 4682736, at *2 (N.D. Ill. Oct. 18, 2017). The Plaintiff's complaint contains no such allegation that any of the callers were merely "dealers" of Defendant or somehow were independent sellers operating a platform run by Prime, nor is that a plausible inference to make under the facts and circumstances here, since Prime itself is alleged to be a lead generator.

As the authorities cited by the Plaintiff counsel, a TCPA defendant cannot simply rely on its own misconduct and attempts to conceal its identity to cast doubt on allegations at the pleadings stage that it directly placed the calls and text messages at issue. Luckily for consumers who receive unwanted calls, this is not the standard. *Abramson v. Josco Energy USA, LLC*, No. 2:21-cv-1322, 2022 U.S. Dist. LEXIS 237792, at *6 (W.D. Pa. Aug. 1, 2022) ("Defendant might dispute those facts, but as now alleged, they go beyond formulaically reciting the elements of Plaintiff's cause of action, and the Court must take them as true at this early stage in the litigation."). That is particularly the case where, as here, the calls are consistent with the Defendant's entire business model of obtaining as much information as possible to ultimately sell leads to law firms. Nothing about that is unconvincing. The Plaintiff has plausibly alleged a theory under which Defendant is directly liable for the calls at issue, and the Plaintiff's allegations must be accepted as true at the pleadings stage. At this point, discovery into the nature of the calls and the evidence, including the 210-405-8263 and 615-219-6257 telephone numbers shared by employees of Defendant, Mr. Garcia's 954-800-2991 and 954-799-8058 phone numbers, and his cgarcia@primemarketingsource.com email are warranted, as these are more than sufficient connections to demonstrate direct liability, as indicated through Exhibit A.

13

As yet another court has held, under similar circumstances as here:

The complaint includes sufficient allegations to support a reasonable inference that the unidentified callers, who allegedly violated the TCPA and the FTSA, worked for the defendants. Upon providing a 321 number to the unidentified caller, the plaintiff received on the 321 line a call from the defendants, who attempted to sell the same product as the unidentified caller. The proximate calls about the same product suggest a common culprit. Forbes argues that the plaintiff's claim "depends entirely on connecting the Authorized Call to the automated calls placed earlier that month to two other phone numbers belong to Tom that were on the [registry]." The allegations support this connection, and the *Twombly* pleading standard countenances a complaint that requires a plausible inference to implicate the defendant.

*Tom v. Forbes*, No. 8:24-cv-1320-SDM-SPF, 2025 U.S. Dist. LEXIS 49113, at *3 (M.D. Fla. Mar. 18, 2025).

In sum, based on the indicia of the calls, the Defendant's own representations on the calls, and the other evidence the Plaintiff gathered, the Plaintiff alleges that the Defendant *directly* placed the calls at issue. Defendant's obfuscative behavior is no different than the common conduct of other individuals in all sorts of criminal enterprises which take steps to hide their involvement. This case is no different and the Defendant should not be rewarded in its obfuscation attempts. The Plaintiff understood these hurdles and investigated the calls, which ultimately identified the Defendant. The Plaintiff alleged that the Defendant *explicitly designed* their telephone marketing strategy in such a way so as to cast doubt on the Plaintiff's allegations when they get sued and to take advantage of their own misconduct. Putting every conceivable hurdle in the face of the Plaintiff investigating the source of the illegal contacts he received is par for the course for the Defendant. The Defendant cannot now cry foul given that the Plaintiff has caught its hand in the cookie jar. As yet another sister court observed in *Cunningham v. Watts Guerra*, LLP. No. SA-22-CV-363-OLG (HJB), 2024 U.S. Dist. LEXIS 93370, at *36 (W.D. Tex. May 23, 2024), the "defendants' argument," identical to the one here that more specificity is required at the pleadings stage, was "untenable." It stated, "To require more would effectively

14

immunize savvier TCPA violators from liability—i.e., those with the wherewithal and means to use middlemen—or a series of increasingly removed middlemen—to solicit business through prohibited robocalling operations." *Id.* Or, as Plaintiff put it, "Defendants' argument, if tenable, would reward robocallers for attempting to obfuscate their identity in order to prevent TCPA liability." *Id.* (cleaned up). The Plaintiff has unquestionably pled a direct liability claim.

The Defendant's "we didn't do it" argument is more properly the subject of a jury trial or at the very least a motion for summary judgment. *Cunningham v. Rapid Response Monitoring Servs., Inc.*, 251 F. Supp. 3d 1187, 1199 (M.D. Tenn. 2017) ("Cunningham has investigated the parties extensively, but inevitably some aspects of their relationships will only come to light in discovery."). These details surrounding the calls are more than sufficient to put Defendant on notice of the claim being asserted and that it is alleged to have made telemarketing calls directly to Plaintiff. "[T]he plausibility standard does not require [the] plaintiff to *definitively* connect [the] defendants to the calls received." *Zeitlin v. Palumbo*, 532 F. Supp. 3d 64, 71 (E.D.N.Y. 2021). Nor does it require the plaintiff to disprove the possibility that the robocall was "placed by some independent third party, from which [the defendant] merely purchased the 'sales lead.'" *Morris*, 2016 WL 1359378, at *2. "Perhaps this is an inference that a factfinder might ultimately make, but at this stage" the Court "must draw all inferences in favor of the plaintiff[ ], not the defendant[ ]." *Edrei v. Maguire*, 892 F.3d 525, 539 (2d Cir. 2018).

Defendant cannot defeat that plausible inference using speculation, for there is no inquiry without a starting point, and the starting points must be accepted as known in some sense, even if they are not known in the strictest sense. To attempt to doubt these starting points at the outset would prevent any inquiry from proceeding. Should this Court at all find the Plaintiff's pleading

15

at all deficient, the Court only need give the order granting the Plaintiff leave to amend and he will do so to rectify any perceived deficiency.

**B.    *The Complaints are not contradictory.***

Defendant cannot be permitted to take advantage of the complicated and obfuscated web that it itself has weaved in an effort to cast doubt on the fact that Defendant itself, through its employees, DeAndre, Tiffany, and Christopher, was the entity responsible for the hundreds of calls the Plaintiff received. Nor can the Defendant fault the Plaintiff for somehow being "contradictory" in the Amended Complaint, which was based on further developed research and tracing of the Plaintiff's records to unweave the elaborate thread Defendant has woven, as illustrated by Exhibit A. As counsel for Plaintiff explained at the pre-motion hearing, the original complaint in this matter was filed before a second look at the Plaintiff's evidence revealed connections that were not readily apparent at the time of drafting, including the connection between "DeAndre" and the calls, including from the 210-405-8263 number. Any perception of inconsistency or alleged contradiction is easily addressed by the understanding that a fresh set of eyes on the facts of the case, particularly in light of Defendant's motion, raised points refuting the Defendant's arguments and making amendment the appropriate course.

And, from the beginning, the Plaintiff had always been proceeding on a direct liability theory, only employing vicarious liability as an alternative. Upon review of the applicable information and evidence linking the callers, the Plaintiff confirms that he is proceeding with, and has adequately alleged evidence of, a direct liability theory. The Plaintiff plainly pleads that this call was sent from Defendant and the evidence he has developed, including the sharing of information, common use of phone numbers, and knowledge of various of the unique information on the call, all support they came from the same place. The Plaintiff is entitled to rely on the Defendant's *very own representations* in this respect, as pled in the Amended

16

Complaint, including the representations from Christopher using the 210-405-8263 number to send text messages, including using the fictitious name "Legal Helpers," since not only did "DeAndre" and "Tiffany" use such names, but because "DeAndre" sent text messages from that very same number. It stretches credulity to claim, at the pleadings stage, that the Plaintiff should not be entitled to take someone at their word when they text the Plaintiff, provide the Defendant's email address as a point of contact, and also receive calls from that same number from an individual using the same fictitious "Legal Helpers name."

Simply put, the Plaintiff has not changed the material allegations in his complaint, as in *Colliton* or *Wallace*. The Plaintiff's original complaint, for example, did not say the light was red, and then changed to read that the light was green. Indeed, all the allegations of the calls made by "Tiffany" remain, as do those of the fact that the Plaintiff identified Prime Marketing through Mr. Garcia. All the plaintiff has done is to add additional factual matter and context supporting those allegations, including how he linked the three individuals to each other, and, ultimately, to Prime Marketing. In this respect, the Plaintiff has merely added an allegation that he was sitting at a malfunctioning red light for seven minutes listening to *We Are the World* before he ran it, not that the light was green when he ran it.[2] Nothing about the additional pleading is contradictory, and this Court should refuse to entertain any attempts to dismiss on this basis either.

## VI.    CONCLUSION

This Court must deny Defendant's motion to dismiss in its entirety. Alternatively, to the extent that the Court finds that additional questions remain, it should permit the Plaintiff to

---

[2] It was under those same circumstances that Plaintiff's counsel's father beat a traffic ticket issued for running a malfunctioning traffic light in 1985, when that song had just been released.

17

amend to correct the deficiencies as necessary.

RESPECTFULLY SUBMITTED AND DATED this May 30, 2025.

> */s/ Andrew Roman Perrong*
> Andrew Roman Perrong, Esq.
> Perrong Law LLC
> 2657 Mount Carmel Avenue
> Glenside, Pennsylvania 19038
> Phone: 215-225-5529 (CALL-LAW)
> Facsimile: 888-329-0305
> a@perronglaw.com
>
> *Attorney for Plaintiff and the Proposed Class*

## CERTIFICATE OF WORD COUNT

In accordance with Judge Wicks' Policies and Procedures, this Memorandum does not exceed 6,500 words.

Dated: May 30, 2025.

> */s/ Andrew Roman Perrong*
> Andrew Roman Perrong, Esq.

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

Dated: May 30, 2025.

> */s/ Andrew Roman Perrong*
> Andrew Roman Perrong, Esq.

18