UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
MATTHEW VANDERSLOOT, *individually and*
*on behalf of all others similarly situated*,

        Plaintiff,

        -against-

CHARLES BARATTA LLC, *doing business as*
PRIME MARKETING,

        Defendant.
-------------------------------------------------------------X

MEMORANDUM
AND ORDER
24-cv-07096 (JMW)

**A P P E A R A N C E S:**

    Andrew Roman Perrong
    **Perrong Law LLC**
    2657 Mt. Carmel Ave
    Glenside, PA 19038
    *Attorney for Plaintiff*

    Laura Kogan
    David Krueger
    **Benesch Friedlander Coplan & Aronoff**
    127 Public Square, Suite 4900
    Cleveland, OH 44114
    *Attorneys for Defendant*

**WICKS**, Magistrate Judge:

    Matthew VanderSloot ("Plaintiff") commenced this action on October 8, 2024, pursuant to the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, asserting that Charles Baratta d/b/a Prime Marketing Source ("Defendant" or "Prime") allegedly called Plaintiff's residential phone number repeatedly despite Plaintiff's registration on the National Do Not Call Registry.[1] (*See generally* ECF Nos. 1, 28.) Plaintiff contends that through use of

---

[1] 47 C.F.R. § 64.1200(c)(2) provides in relevant part that: "A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government. Such do-not-call

1

fictitiously named individuals who allegedly worked for various non-existent companies and entities, Defendant initiated calls to Plaintiff over one hundred times without Plaintiff's consent in an attempt to solicit Plaintiff filing a potential Camp Lejeune claim.[2] (*See* ECF No. 28 at ¶¶ 22-23.)

Before the Court at this time is Defendant's motion to dismiss the Amended Class Action Complaint for failure to state a claim under Rule 12(b)(6). (ECF No. 33.) Having considered the parties' filings and oral argument, Defendant's motion to dismiss is **DENIED**.

## FACTUAL BACKGROUND

The following facts are taken from the Amended Complaint (ECF No. 28), which are assumed true for purposes of considering the motion to dismiss.

Plaintiff commenced this lawsuit asserting a violation of the TCPA on behalf of himself and the National Do-Not-Call ("DNC") Class. (*Id.* at ¶ 3.) Despite having registered his phone number on the National Do Not Call Registry "more than 31 days prior to the calls at issue," Plaintiff contends that "Defendant, or its affiliates, agents, or other persons or entities acting on Defendant's behalf violated the TCPA by causing multiple telephone solicitation calls or text messages to Plaintiff . . . .". (*Id.* at ¶¶ 17, 64.) Indeed, as Plaintiff avers, Defendant's entire business model is structured around relying on "illegal telemarketing, including using fictitious names to hide their identify" to generate "leads" from potential individuals interesting in filing lawsuits, and subsequently selling that information to law firms. (*See id.* at ¶¶ 19-21.)

---

registrations must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator."

[2] A "Camp Lejeune claim" refers to a lawsuit filed by individuals—namely Veterans—that may have been exposed to contaminated water at the Marine Corps Base Camp in Lejeune, North Carolina. *See* United States Government, *Camp Lejeune Justice Act Claims*, AMERICA'S NAVY, https://www.navy.mil/clja/Help-me-understand-the-difference-between-CLJA-claims-and-VA-claims/

Beginning on August 30, 2023, Plaintiff maintains that he received "over approximately one hundred calls" from supposedly fictitious individuals named "Tiffany," "DeAndre," and "Christopher," working for allegedly non-existent companies, including "Legal Helpers" and "Medical Health Department," seeking to solicit Plaintiff for legal representation in a Camp Lejeune claim. (*Id.* at ¶ 22.) Plaintiff avers that these calls were unwanted, nonconsensual, and resulted in violations of Plaintiff's and the DNC Class's privacy rights. (*See id.* at ¶¶ 49-53.) Notably, Plaintiff maintains that all calls from these entities and individuals were placed "directly by Defendant." (*Id.* at ¶ 23; *see also id.* at ¶ 25 (arguing that Legal Helpers is Defendant)).

    **a.** *Timeline of the Calls and Messages to Plaintiff*

On August 30, 2023, the first of the series of calls supposedly came from "DeAndre," a purported employee of "Legal Helpers" using a "spoofed" phone number, (208) 681-7762, during which time Plaintiff allegedly provided "unique information" to "DeAndre," such as his email address and name. (*Id.* at ¶ 24.) From September 4, 2023 through January 10, 2024, "DeAndre" from "Legal Helpers," in addition to "Tiffany" from the "Medical Health Department," made "at least 69 calls" to Plaintiff. (*Id.* at ¶ 26.) The calls were supposedly for the purpose of obtaining more information about the August 30 call between Plaintiff and "DeAndre," including to follow up on the Camp Lejeune claim Plaintiff initially discussed with "DeAndre." (*Id.*) In fact, Plaintiff alleges that "Tiffany" possessed the information that Plaintiff provided "DeAndre" during the August 30 call. (*Id.*)

For example, around September 18, 2023, Plaintiff received text messages from "DeAndre" and "Tiffany" with respect to a potential retainer agreement for Plaintiff. (*Id.* at ¶ 27.) Both individuals attempted to ascertain why Plaintiff had not received the agreement which was to be sent to Plaintiff's email from a 615-219-6257 number. (*Id.*) Plaintiff alleges that each these

3

"spoofed" calls, in addition to text messages sent by "DeAndre" and "Tiffany," were sent by various, supposedly fictitious numbers, including: (208) 900-6666, (615) 653-4187, (210) 405-8263, (872) 760-0218, (872) 760-0759, (713) 357-5174. (*Id.* at ¶¶ 26-27.)

On September 20, 2023, and September 27, 2023, Defendant allegedly sent a text message from the (210) 405-8263 telephone number, a number that Plaintiff maintains "is a direct telephone number owned and operated by the Defendant in the Defendant's name," to Plaintiff identifying itself as "DeAndre" with "Legal Helpers." (*Id.* at ¶¶ 28-29.) Shortly thereafter, on September 28, 2023, Plaintiff requested to be placed on Defendant's Do Not Call List, but "Tiffany" continued to contact Plaintiff, including on November 16, 2023, using the previously mentioned (615) 219-6257 number. (*Id.* at ¶ 30.)

The calls continued. On January 10, 2024, Plaintiff allegedly received "at least seven calls" from "Tiffany" from the "Medical Health Department" using a (713) 405-3514 number. (*Id.* at ¶ 31.) During the last of the calls, "Tiffany" allegedly asked Plaintiff if he received calls from "[Tiffany's] law associate" from a (954) 800-2991 number, and that Plaintiff should "just search for that number." (*Id.* at ¶ 32.) Plaintiff called this number and spoke with "Christopher Garcia" who provided "cgarcia@primemarketingsource.com" as his email address and a callback number of (954) 799-8058. (*Id.* at ¶ 33.) "Christopher Garcia" followed this call with an email regarding a Camp Lejeune claim which "also originated from the Defendant's email." (*Id.*) As Plaintiff contends, the two "954" numbers "are direct telephone numbers owned and operated by the Defendant in the Defendant's name." (*Id.* at ¶ 34.)

Following this call with "Christopher," Plaintiff received a text message on January 10, 2024 from the 210-405-8263 number that read "954-799-8058 Chris G calls only" and another message saying "*cgarcia@primemarketingsource.com*." (*Id.* at ¶¶ 36-37.) "Christopher"

4

purportedly then sent Plaintiff a text message from the "210" number including a link, https://app.lawmatics.com/forms/share/4a8458c2-b30b-462f- b8ab-8cfc3184a7e5, to a website to upload Plaintiff's ID. (*See id.* at ¶ 38.) Clicking on this lawmatics.com link, according to Plaintiff, "reveals that it is prompting for an individual named "Matthew," the Plaintiff, to upload his ID." (*Id.*)

Shortly thereafter, on January 17, 2024, Plaintiff received a call from "Christopher" using the same "210" number to speak with Plaintiff about his Camp Lejeune claim. (*Id.* at ¶ 39.) As Plaintiff avers, "Tiffany" followed this call with a text using the 615-219-6257 number asking Plaintiff to fill out identification verification and registration forms "Christopher" previously provided to Plaintiff using the 210-405-8263 number. (*See id.*) Similarly, the following day, Plaintiff received another message from the 210-405-8263 number stating it was "Christopher Gee from Legal Helpers" inquiring about a Camp Lejeune claim. (*Id.* at ¶ 40.) That same message left a callback number as 954-799-8058, the same number "Christopher Garcia" mentioned during the January 10, 2024 call with Plaintiff. (*See id.* at ¶¶ 40-41.)

As Plaintiff asserts, the 210-405-8263 "number is *critical* . . . as this is the *same telephone number* that 'DeAndre' with 'Legal Helpers' texted the Plaintiff from on September 20 and 27 . . . .". (*Id.* at ¶ 43) (emphasis in original). Indeed, Plaintiff contends that "Christopher" identified himself as being from Defendant Prime Marketing through prior text messages from that same 210-405-8263 number. (*See id.* at ¶ 44.) In addition, as Plaintiff alleges, "Christopher" provided an email address with Defendant's name in it, yet subsequently told Plaintiff he was from "Legal Helpers," thereby establishing that "Legal Helpers" is a fake name used by Defendant. (*See id.*) It is through these circumstances that Plaintiff contends that "'Tiffany' from

5

'Medical Health Department' and 'Chris' and 'DeAndre' calls from 'Legal Helpers' were in fact uncovered as originating from the Defendant . . . .". (*See id.* at ¶¶ 46-48.)

These factual circumstances are reflected in the following chart which Plaintiff attached to its Memorandum of Law in Opposition and utilized as a demonstrative during oral argument held on July 8, 2025.



(ECF No. 35-1, Ex. A)

6

## PROCEDURAL BACKGROUND

On November 25, 2024, Defendant requested a pre-motion conference in anticipation of filing a motion to dismiss Plaintiff's original Complaint. (ECF No. 11.) Plaintiff opposed on December 5, 2024. (ECF No. 15; *see* ECF No. 18 (so ordered consent)). Defendant thereafter filed its initial motion to dismiss on January 24, 2025 and, shortly after doing so, the Court granted Defendant's motion to stay discovery pending the determination of Defendant's motion to dismiss finding, *inter alia*, that Defendant made a strong showing that Plaintiff's claims may lack merit under direct and vicarious theories of liability under the TCPA. (*See* Electronic Order dated February 7, 2025.)

Plaintiff filed its Amended Complaint on February 13, 2025. (ECF No. 28.) Consequently, the Court denied Defendant's motion to dismiss as moot without prejudice and with leave to renew as to the Amended Complaint. (*See* Electronic Order dated February 18, 2025.)  On February 27, 2025, Defendant filed a letter for a pre-motion conference to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). (ECF No. 29.) Plaintiff opposed on March 11, 2025 (ECF No. 30), and at the April 3, 2025 conference a briefing schedule was set (ECF No. 31.)

Defendant filed its motion to dismiss the Amended Class Action Complaint on May 2, 2025 (ECF Nos. 33-34), Plaintiff submitted his opposition on May 30, 2025 (ECF No. 35), and Defendant replied on June 16, 2025. (ECF No. 36.) The parties appeared before the undersigned for Oral Argument on Defendant's motion on July 8, 2025. (ECF No. 37.)

# **THE LEGAL FRAMEWORK**

a. *Motion to Dismiss under Rule 12(b)(6)*

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558.

When considering a motion to dismiss under 12(b)(6), the Court must assume all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, this tenet does not apply to mere legal conclusions, and a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. More is required. Indeed, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action.") (citation omitted).

b. *The Telephone Consumer Protection Act*

Congress enacted the TCPA in response to "[v]oluminous consumer complaints about abuses of telephone technology[.]" *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 370–71 (2012). As the Supreme Court observed in *Facebook, Inc. v. Duguid*,

> In 1991, Congress passed the TCPA to address "the proliferation of intrusive, nuisance calls" to consumers and businesses from telemarketers. §2, ¶¶1, 6, 105 Stat. 2394, note following 47 U. S. C. §227. Advances in automated technology made it feasible for companies to execute largescale telemarketing campaigns at a

8

> fraction of the prior cost, dramatically increasing customer contacts. Infamously, the development of "robocall" technology allowed companies to make calls using artificial or prerecorded voices, obviating the need for live human callers altogether.

592 U.S. 395, 398 (2021).

"The heart of the TCPA consists of two subsections: Sections 227(b) and 227(c)[.]" *Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 200 (S.D.N.Y. 2024). Relevant here, section 227(c),[3] addresses "telephone solicitations that intrude on the privacy of the subscriber, regardless of whether they are transmitted by an ATDS or an artificial or prerecorded voice; it therefore has a markedly different scope and structure [than Section 227(b)]." *Id.* at 201. Those subscribers listed on the DNC Registry are afforded a private right of action provided they have received "more than one telephone call within any 12-month period by or on behalf of the same entity in violation of" the implementing regulations.[4] 47 U.S.C. § 227(c)(5); *Rockwell v. Medicus Healthcare Solutions, LLC*, No. 24-CV-128-LJV, 2025 WL 9599745, at *2 (S.D.N.Y. Mar. 31, 2025) (finding that "the TCPA and its implementing regulations prohibit making more than one solicitation call within a 12-month period to a number listed on a do-not-call registry provided for by the FCC.") (referencing 47 U.S.C. § 227(c)(5)).

"Under the TCPA, a plaintiff must either allege either (1) direct liability (*i.e.*, that the defendant placed the robocall) or (2) vicarious liability (*i.e.*, that the defendant has an agency relationship with the third-party that placed the robocall)." *Martin v. Bottom Line Concepts, LLC*, 723 F. Supp. 3d 270, 282 (S.D.N.Y. 2024). Here, Plaintiff is *solely* pursuing a claim of direct

---

[3] During Oral Argument, the parties agreed this case is one under § 227(c).

[4] The parties, during Oral Argument, agree there is no dispute that there were multiple calls made within the relevant time period under the TCPA and that Plaintiff has sufficiently pled a violation of "Do-Not-Call Registry" element. The parties dispute whether Prime directly made the calls at issue and, therefore, whether it is directly liable under the TCPA.

9

liability. (*See* ECF No. 31 ("Plaintiff stipulated on the record that on the current Amended Complaint only claims of direct liability under the Telephone Consumer Protection Act are sought and that it does not encompass a claim of vicarious liability. The parties motion papers, accordingly, shall be addressed solely with respect to a direct liability claim.")).

For a claim of direct liability to survive at the motion to dismiss stage, a plaintiff need not "come forward with allegations or evidence conclusively negating the possibility" that none of the parties initiated the call. *Bank v. CreditGuard of America*, No. 18-CV-1311 (PKC) (RLM), 2019 WL 1316966, at *8 (E.D.N.Y. Mar. 22, 2019) (quoting *Morris v. SolarCity Corp.*, No. 15-cv-05107-RS, 2016 WL 1359378, at *2 (N.D. Cal. Apr. 6, 2016)). Instead, a plaintiff need only plead "factual content [that] allows the court to draw the *reasonable inference* that [the defendant] is liable for the misconduct alleged." *Ashcroft*, 566 U.S. at 678 (emphasis added); *see Zeitlin v. Palumbo*, 532 F. Supp. 3d 64, 71 (E.D.N.Y. 2021) (collecting cases denying motions to dismiss where the facts alleged allowed the court to plausibly infer direct liability as the "plausibility standard does not require plaintiff to *definitively* connect defendants to the calls he received") (emphasis in original).

"Although Plaintiff does not have to 'definitively connect' Defendant to the call, he does have to allege facts from which the Court can plausibly infer that Defendant has direct liability, even if it is also plausible that a third party made the call." *Metzler v. Pure Energy USA LLC*, No. 21-CV-9798 (VEC), 2023 WL 1779631, at *6 (S.D.N.Y. Feb. 6. 2023) (citing *Zeitlin*, 532 F. Supp. 3d at 71)); *Aaronson v. CHW Group, Inc.*, No. 18-cv-1533, 2019 WL 8953349, at *2 (E.D. Va. Apr. 15, 2019) ("Accordingly, at the pleading stage, plaintiff must allege facts to support his conclusion or belief that defendant is the party that made the calls to plaintiff's cellular phone.").

## DISCUSSION

a. *Whether the Amended Complaint Contradicts the Allegations in the Original Complaint*

Defendant argues that the allegations contained in the Amended Complaint directly contradict facts asserted in Plaintiff's original Complaint so much so that the "conflicting complaints" are prejudicial and the contradicting allegations ought to be dismissed. (ECF No. 34 at p. 14.) Defendant not only points to the contradictions between how many calls Plaintiff alleged took place and when Plaintiff discovered Prime to be the entity behind the calls, but also that Plaintiff initially sought a theory of vicarious liability but, following this Court's Order noting that "Plaintiff's theory of vicarious liability will likely fail," Plaintiff solely pursued a theory of direct liability. (*Id.*; *see* Electronic Order dated February 7, 2025.) In sum, Defendant avers that "Plaintiff's theory of liability in the [Amended Complaint] is even weaker than his theory of liability in the original complaint." (ECF No. 34 at p. 15.) Plaintiff rebuts that the complaints are not contradictory. (*See* ECF No. 35 at pp. 19-20.) Indeed, Plaintiff "further developed research and tracing of the Plaintiff's phone records" led to Plaintiff discovering "connections that were not readily apparent at the time of drafting [the Initial Complaint]." (*Id.* at p. 19.) Additionally, Plaintiff notes that he has always proceeded under a theory of direct liability with vicarious liability as an alternative. (*See id.*)

While courts may disregard allegations in an amended pleading where those allegations directly contradict facts pled in a prior pleading, they do so only "in special circumstances." *Scarola Malone & Zubatov LLP v. Verizon Communications, Inc.*, No. 14-cv-4518 (PKC), 2015 WL 3884211, at *5 (S.D.N.Y. June 24, 2015) (collecting cases); *see Johnson v. Everyrealm, Inc.*, 657 F. Supp. 3d 535, 541, n.2 (S.D.N.Y. 2023) ("Where, however, an amended pleading is not in 'direct' contradiction with the original pleading, courts apply the general rule recognizing that an

11

amended pleading completely replaces the original pleading") (quotation omitted). Indeed, where allegations in the amended complaint are not blatantly contradictory, courts will not abandon the "usual deference" afforded to an amended complaint and should thus accept the factual allegations in the amended pleading as true. *Bernadotte v. New York Hosp. Med. Ctr. of Queens*, No. 13-CV-965 (MKB), 2014 WL 808013, at *6 (E.D.N.Y. Feb. 28, 2014).

Here, the allegations of the Amended Complaint do not directly contradict the facts pled in the original Complaint. For instance, in the original Complaint, Plaintiff alleges that "Tiffany" from the "Medical Health Department" called Plaintiff numerous times beginning in September 2023 to January 2024. (ECF No. 1 at ¶¶ 19-21.) Plaintiff also avers that after "Tiffany" asked Plaintiff if he spoke with "Tiffany's" law associate, Plaintiff called the number provided by "Tiffany" and spoke with Christopher Garcia who provided a Prime email address. (*See id.* at ¶¶ 21-22.)

Likewise, in the Amended Complaint, Plaintiff includes similar, if not identical, allegations while providing additional support—like naming entities, individuals, and phone numbers within the alleged telephone scheme—rather than contradicting original allegations. (*See* ECF No. 28 at ¶ 26 ("[S]tarting on September 4, 2023 and continuing through January 10, 2024, the Plaintiff received at least 69 calls from 'Tiffany' at the 'Medical Health Department' and 'DeAndre' from 'Legal Helpers.'"), ¶ 32 ("'Tiffany' inquired if the Plaintiff had received calls from her 'law associate'"), ¶ 33 (identifying Christopher Garcia as the "law associate" of "Tiffany" who possessed the cgarcia@primemarketingsource.com email address). *Au fond*, Plaintiff's Amended Complaint provides additional factual support for this conclusions generated in his Original Complaint. *See Operadora Kau-Kau v. Prodigy Networks, LLC*, No. 20 CV 2770 (ALC), 2021 WL 4482212, at *3 (S.D.N.Y. Sept. 30, 2021) (rejecting the argument that the

12

allegations in the second amended complaint should be disregarded where the amended pleading merely "attempts to expend on deficiencies" in the original amended complaint).

Further, both the original and Amended Complaint assert causes of action under the same statutory provision—Section 227(c)(5) of the TCPA. (*See* ECF No. 1 at ¶¶ 9, 12; *see also* ECF No. 28 at ¶¶ 9, 12.) Moreover, Plaintiff *did* assert a claim of direct liability in its original Complaint. (ECF No. 1 at ¶ 23 (alleging that the calls originated from Defendant)). Importantly, through his Amended Complaint, Plaintiff supplies additional facts and helps connect the dots to demonstrate how "DeAndre," "Tiffany," Christopher Garcia and "Legal Helpers" are connected to Prime, thereby bolstering Plaintiff's theory of direct liability. *See Palm Beach Strategic Income, LP v. Salzman*, No. 10-CV-261 (JS) (AKT), 2011 WL 1655575, at *6 (E.D.N.Y. May 2, 2011) ("[I]n a typical case, a prior inconsistent pleading should not trump the Court's obligation under Rule 12(b)(6) to accept a complaint's allegations as true," especially where there are "valid reasons" for amending a complaint like "acquir[ing] new information through discovery, or its own investigation, that fundamentally alters its theory of the case.").

Accordingly, to the extent Defendant urges dismissal based upon inconsistencies between the two pleadings, that ground is rejected. The Court, therefore, proceeds to analyze whether assuming the truth of the allegations of the Amended Complaint are sufficiently pled for a claim of direct liability under the TCPA.

  b. *Direct Liability Under the TCPA*

Defendant avers that no claim for direct liability exists as the Amended Complaint "fails to plausibly allege that Prime made any calls," namely that "any representative who initiated a call to Plaintiff admitted to placing calls on behalf of Prime, identified themselves as employees of Prime, nor does Plaintiff allege any facts to suggest that the supposed 'law associate' . . . is

13

any way related to Prime." (ECF No. 34 at pp. 6, 10.) Indeed, as Defendant argues, Plaintiff failed to "allege or identify facts to explain what steps Prime took to place the calls, or any other detail about Prime's ownership of the number." (*Id.* at p. 16.) Further, Defendant maintains no direct liability exists because Plaintiff's first alleged contact with Prime was when *he* called Prime and, until then, Plaintiff had not received any calls from Garcia. (*Id.* at p. 10.)

Conversely, Plaintiff argues that "*specific evidence in the record*" connects the calls, and the entities that placed them, to Prime. (ECF No. 35 at p. 12) (emphasis in original). Indeed, this evidence demonstrates direct liability because, as Plaintiff contends, "it establishes that two sets of two allegedly unrelated individuals somehow have access to the same phone numbers and sets of information to send text messages to Plaintiff." (*Id.* at p. 10.) Namely, Plaintiff alleges that the evidence at this juncture is sufficient to show that Christopher is Prime's employee and "is connected to the other two individuals who are also alleged to be Prime employees, including because they share the same information and telephone numbers." (*Id.* at p. 13.)

In order to establish direct liability under the TCPA, a plaintiff must allege that a defendant initiated the unsolicited call. *Banks v. Pro Custom Solar*, 416 F. Supp. 3d 171, 173 (E.D.N.Y. 2018); *see Bank v. Vivint Solar, Inc.*, No. 18 Civ. 2555 (MKB) (RLM), 2019 WL 2280731, at *2 (E.D.N.Y. Feb. 25, 2019) (dismissing a direct liability claim under the TCPA where there was "an insufficient basis upon which to infer that [the defendant] made the [unsolicited call]"), *report and recommendation adopted*, 2019 WL 1306064 (E.D.N.Y. Mar. 22, 2019). "'A person or entity "initiates" a telephone call when it takes the steps necessary to physically place a telephone call, and generally does not include persons or entities, such as third-party retailers, that might merely have some role, however minor, in the causal chain that results in the making of a telephone call.'" *Bank v. Pro Custom Solar LLC*, No. 17-cv-00613

14

(LDH) (JO), 2020 WL 5242269, at *2 (E.D.N.Y. Mar. 31, 2020) (quoting *In re Joint Petition filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6582 (2013)); *see also Melito v. American Eagle Outfitters, Inc.*, No. 14-CV-02440 (VEC), 2015 WL 7736547, at *4 (S.D.N.Y. Nov. 30, 2015) (concluding plaintiff's amended complaint failed to state a plausible claim under direct liability because plaintiff did not plead that defendant "'made,' *i.e.*, physically placed or actually sent, the text messages").

For example, in *Martin v. Bottom Line Concepts, LLC*, 723 F. Supp. 3d 270 (S.D.N.Y. 2024), plaintiff's direct liability claim withstood a motion to dismiss. There, plaintiff alleged he received prerecorded messages from defendant Bottom Line Concepts ("BLC") and, upon calling the number back, received the message: "Thank you for calling the Employee Retention Hotline brought to you by Bottom Line Capital." *Id.* at 275. Bottom Line Capital, as plaintiff alleged, "is a d/b/a/ of BLC." *Id.*  Similarly, the court noted that plaintiff pled that the phone number from which the robocall was played, when called back, played the message about Bottom Line Capital and later pled that Bottom Line Capital is a trade name used by BLC. *Id.* at 282.

Indeed, Judge Engelmayer determined that based on the allegations in the amended complaint, "a reasonable factfinder" could draw the following inferences:

> That Bottom Line Capital owned and controlled the phone number used to place the robocall to Martin; that Bottom Line Capital, as the owner of the phone number used to place the robocall, and as the beneficiary of the message conveyed via the robocall, placed the robocall; and that Bottom Line Capital is a pseudonym of BLC, such that an action by Bottom Line Capital is an action by BLC.

*Id.* at 282-83.

The amended complaint, therefore, pled factual content allowing the court to "draw the reasonable inference that [BLC] is liable for the misconduct alleged" and "supporting the inference of a relationship between [Bottom Line Capital] and the defendant (BLC)." *Id.*

Similarly, in *Bank v. CreditGuard of America*, No. 18-cv-1311 (PKC) (RLM), 2019 WL 1316966, at *8 (E.D.N.Y. Mar. 22, 2019), the court determined that plaintiff adequately pled a theory of direct liability against one set of named defendants, the "Freedom Financial defendants." There, after receiving an automated call, plaintiff was transferred to a live operator who identified himself as a credit advisor of defendant "CGA." *Id.* at *2. This individual would later call from a "838" phone number which, as plaintiff argued, belonged to defendant CGA. *Id.* at *2. Plaintiff subsequently dialed another number which it alleged belonged to defendant CGA and spoke with a representative who said the prior "838" call was someone from Freedom Financial, a debt settlement company working with defendant CGA. *Id.* In finding direct liability on the part of the Freedom Financial defendants, the court noted that although the initial call did not state the name or person on whose behalf the call was placed, plaintiff alleged that "in the course of his follow-up investigation and conversations with various CGA and Freedom Defendant-affiliated individuals, he confirmed that the live operator" was from Freedom Financial. *Id.* at *8. The plaintiff further pled facts to support the correlation between defendant and the fictitious entity by alleging the two had done business under the same name and shared the same principal place of business. *Id.*

Here, Plaintiff alleges that he received messages from Defendant. (ECF No. 28 at ¶¶ 23, 24.) Like in *Martin*, upon Plaintiff calling back the number "Tiffany" provided to him, he was

16

put in touch with "Christopher G," the individual possessing Prime's email address[5] who also later identified himself as being from "Legal Helpers." Furthermore, Plaintiff alleges that Christopher G sent messages to Plaintiff using Prime's email address on several occasions and even utilized the same "201" number "DeAndre" from "Legal Helpers" used to contact Plaintiff. Therefore, just as it was plausible for the plaintiff in *Martin* to infer that Bottom Line Capital was a pseudonym of BLC, and just as the plaintiff in *CreditGuard of America* pled facts sufficient to infer a correlation between the two entities at issue, it is equally plausible for Plaintiff to allege, and for a reasonable factfinder to infer, that "Legal Helpers" is interchangeable with Prime such that actions taken by "Legal Helpers" are actions by Defendant. (*See* ECF No. 28 at ¶ 25 ("In other words, 'Legal Helpers' *is* Defendant Prime Marketing Source") (emphasis in original)). The same holds true for "Tiffany" from the "Medical Health Department" considering she directed Plaintiff to dial the "954-800-2991" number to speak to Chris G., "*her* law associate" and asked Plaintiff to fill out the identical verification and registration link that Chris G. had previously sent. (*See* ECF No. 28 at ¶¶ 32, 39; ECF No. 28 at ¶ 45 (contending "Legal Helpers" and the "Medical Health Department" were entities were fake names used by Defendant to conceal its identity)).

 *Au fond*, Plaintiff effectively connects the dots between the phone numbers and "fictitious" individuals and how they trace back to Defendant Prime. *See Jubb v. CHW Grp., Inc.*, No. 23cv23382 (EP) (MAH), 2025 WL 942961, at *4 (D. N.J. Mar. 28, 2025) (finding direct liability existed where plaintiff alleged defendant placed the texts and the complaint provided additional support "as to how these calls trace back to [defendant]"); *but see Aaronson*, 2019 WL

---

[5] During Oral Argument, though counsel for Defendant asserted that he was unsure whether Christopher Garcia works for Defendant, he later responded "I believe so" when asked if the email address provided by Christopher Garcia was an email address used by Prime.

17

8953349, at *2 (rejecting a direct liability claim because "without any facts to explain why plaintiff believes the identified phone number is owned by defendant," plaintiff's allegation that the party that called his phone originated from "one of the Defendant's many telephone numbers" is conclusory and insufficient under the TCPA).

In addition, and similar to plaintiff in *CreditGuard of America*, Plaintiff's "follow-up investigation," including calling the "law associate's number" that "Tiffany" provided, confirmed his belief that Defendant was acting as these fictitious entities. At bottom, the initial calls and messages named the person on whose behalf the call was placed—"DeAndre" from "Legal Helpers" and "Tiffany" from the "Medical Health Department"—and Plaintiff's follow-up searches and calls confirmed Defendant's placement in this scheme.

Moreover, the messages and calls Plaintiff received all related to his potential Camp Lejeune claim, inquired into different stages of the application process (*e.g.*, the identification registration link), and involved "unique information" that Plaintiff shared with one of the allegedly fictitious entities, oftentimes to the exclusion of the others. *See Morris*, 2016 WL 1359378, at *2 (finding "it [was] perfectly reasonable to infer" that defendant was "in some manner responsible" for prior calls from the fact its representative asked plaintiff to confirm the name and address plaintiff provided it "neither of which he had ever provided to anyone else"). At the motion to dismiss stage, these allegations are sufficient to raise the plausible inference that Defendant was responsible for initiating the calls and messages Plaintiff received.

The cases that have dismissed direct liability claims do not compel a contrary conclusion. For example, in *Metzler v. Pure Energy USA LLC*, plaintiff had not adequately pled direct liability because the "only non-conclusory allegation that even [came] close to alleging that Defendant initiated the offending telephone call" was that plaintiff spoke to a representative for

18

defendant who began enrolling plaintiff in defendant's services. 2023 WL 1779631, at *6. As such, the court noted that while "[t]hose facts confirm that the voicemail related to Defendant," the court was unable to infer defendant made the call as opposed to a telemarketer "working to drum up business" for the defendant. *Id.* Here, contrary to the "non-conclusory allegations" in *Metzler*, Plaintiff offers a plethora of allegations connecting the calls made across entities to individuals like Christopher G—the one who identified himself as from "Legal Helpers" and who used the same "210" phone number "DeAndre" used all while maintaining a Prime email address.

Similarly, in *Vivant Solar*, the court dismissed plaintiff's theory of direct liability because although the complaint alleged that defendant "placed, or directed to be placed," the robocall, it did not plead any specifics as to the source of the call or the entity or entities whose business was being promoted. 18-CV-2555 (MKB), 2019 WL 2280731, at *2 (E.D.N.Y. Feb. 5, 2019), *report and recommendation adopted*, 2019 WL 1306064 (E.D.N.Y. Mar. 22, 2019). Further, because the prerecorded call plaintiff asserts was made by defendant did not disclose the name, address, or phone number on whose behalf the call was being made, the court was unable to ascertain whether defendant "initiated" the call for a showing of direct liability. *Id.*

Unlike *Vivant Solar*, a perscrutation of the Amended Complaint reveals nothing short of specifics identifying the sources of the calls and even the entities on whose behalf they were calling. Those entities are ultimately tied to Prime—whether it be through the facts pertaining to Christopher G's dual role as a member of "Legal Helpers" with a Prime email address, or through "Tiffany's" role as "associate" of Chris and who allegedly provided Plaintiff's "unique information" to individuals like "DeAndre" during the August 30 call. Indeed, given the connection pled between Christopher G with a Prime address, and being Chris G from "Legal

19

Helpers," Plaintiff's assertion that those individuals calling on behalf of "Legal Helpers" were effectively calling on behalf of Prime—the entity whose business was being promoted—is plausible.

At this nascent stage of a motion to dismiss, it is not the Court's function to resolve factual issues, nor is it Plaintiff's burden to "come forward with allegations or evidence conclusively negating the possibility" that Defendant did not initiate the calls or messages at issue. *CreditGuard of America*, 2019 WL 1316966, at *8 (citing *Morris*, 2016 WL 1359378, at *2). Because Plaintiff presents sufficient allegations that raise a plausible inference that Defendant initiated the calls and messages to Plaintiff, Plaintiff's direct liability claim ought to proceed to discovery.

## CONCLUSION

For the reasons stated above, Defendant's motion to dismiss the Amended Complaint with prejudice (ECF No. 33) is **DENIED**. The stay of discovery ordered on February 7, 2025 is hereby vacated, and the parties are directed to meet and confer to prepare and file on or before **July 23, 2025** a proposed scheduling order that addresses: end date for fact discovery; dates for expert reports and disclosures in chief and rebuttal; and end date of expert discovery.

Dated: Central Islip, New York
       July 9, 2025

                                            **SO ORDERED**,

                                      /S/ *James M. Wicks*
                                         JAMES M. WICKS
                                    United States Magistrate Judge